STATE, APPELLANT, *v.* KEARNS, ADMINISTRATOR, ET AL.,
RESPONDENTS.

(No. 6,098.)

(Submitted April 25, 1927. Decided May 7, 1927.)

[257 Pac. 1002.]

*Escheat—All Property Subject to—When Title Vests in State—
Executors and Administrators—Deposit of Estate Funds
in Insolvent Bank—When Officer not Personally Liable to
State.*

Escheat—All Property Subject to—Title Vests in State, When.
1. While under the common law only the real property of an intestate decedent leaving no heirs competent to take escheated to the state, title vesting in the state immediately, under section 206, Revised Codes 1921, all property, real, personal and every right of property of whatever nature, is subject to escheat, but title thereto does not vest in the state until institution by the attorney general of an action to reduce the property to the possession of the state, and favorable judicial determination thereof.

Same—Executors and Administrators—State may Object to Accounts Prior to Vesting of Title.
2. Though proceedings by the attorney general to reduce alleged escheated property to the possession of the state may not, under section 7088, Revised Codes 1921, be commenced within five years after the death of the decedent, the state is possessed of sufficient interest in the estate prior to the institution of such proceedings, to warrant that officer in objecting to the settlement of the administrator's accounts.

Same—Executors and Administrators—Deposit of Estate Funds in Bank Subsequently Becoming Insolvent—Administrators not Personally Liable, When.
3. An administrator who exercises reasonable care in the selection of a bank in which to deposit estate funds will not be held personally liable for loss of such funds because of the bank's insolvency; hence where an administrator of an escheated estate was not required to pay over to the state funds in his hands until after the escheat had been judicially declared (see par. 1, above) and such adjudication was not had until after the bank in which the funds were deposited had suspended business, he was properly held not personally liable for any loss sustained by the state.

[1]   Escheat, 21 **C. J.**, sec. 3, p. 851, n. 39, 40; sec. 10, p. 854, n. 88, 89; sec. 16, p. 855, n. 22, 23; sec. 19, p. 856, n. 36.
[2]   Executors and Administrators, 24 **C. J.**, sec. 2449, p. 1007, n. 83.
[3]   Executors and Administrators, 24 **C. J.**, sec. 467, p. 50, n. 7, 8.

1. Judicial proceeding, as necessary to vest title to real property in state by escheat, see note in 12 **A. L. R.** 1237. See, also, 10 **R. C. L.** 617.
3. See 11 **R. C. L.** 150.

*Appeal from District Court, Park County; H. J. Miller, Judge.*

ACTION by the State against W. L. Kearns, administrator of the estate of Joseph Brown, deceased, and another. Judgment for defendants and plaintiff appeals. Affirmed.

*Mr. L. A. Foot,* Attorney General, and *Mr. C. N. Davidson,* Assistant Attorney General, for Appellant, submitted a brief; *Mr. Davidson* argued the cause orally.

By the great weight of authority it is held that title will vest at once in the state without an inquest of office and that no proceedings are necessary to effect the escheat where the owner dies intestate without leaving any inheritable blood. (*Louisville School Board* v. *King,* 15 L. R. A. (n. s.), p. 382; *Cunningham* v. *Browning,* 1 Bland Ch. (Md.) 299; *State ex rel. Roberts* v. *Reeder,* 5 Neb. 203; *O'Hanlin* v. *Den,* 20 N. J. L. 31; *Den ex dem. Van Kleck* v. *O'Hanlon,* 21 N. J. L. 582; *McCaughal* v. *Ryan,* 27 Barb. (N. Y.) 376; *Ettenheimer* v. *Heffernan,* 66 Barb. (N. Y.) 374; *Doe ex dem. Blaunt* v. *Horniblea,* 3 N. C. (2 Hayw.) 36; *Hinkle* v. *Shadden,* 2 Swan (Tenn.), 46; *Puckett* v. *State,* 1 Sneed (Tenn.), 355; *State* v. *Goldberg,* 113 Tenn. 298, 86 S. W. 717; *Ellis* v. *State,* 3 Tex. Civ. App. 170, 21 S. W. 66, 24 S. W. 660; *Sands* v. *Lynham,* 27 Gratt. (Va.), 291, 21 Am. Rep. 348; *State* v. *Stevenson,* 6 Idaho, 367, 55 Pac. 886; *United States* v. *Fish,* 5 Ala. 31.)

Section 9959, Revised Codes of 1921, provides: "When the attorney general is informed that any real estate has escheated to this state, he must file an information in behalf of the state in the district court of the county in which such estate, or any part thereof, is situated." This section makes no reference whatever to personal property. The reason for the requirement of an action with respect to real property, assuming that an action is necessary to escheat, is that this formality was deemed necessary before the state could sell the property and convey title thereto. When the property has been sold,

the money is deposited in the state treasury, there to wait the appearance of heirs to claim the same within the period fixed by the statute. No reason, therefor, exists why a proceeding should be necessary to escheat money and this is borne out by the provisions of section 7089, which provides: "and the same or the proceeds thereof to be deposited in the state treasury." "The same" has reference to the property which the attorney general is directed to reduce to the possession of the state. The defendant was not justified, therefore, in retaining possession of the money of the estate, awaiting an action on the part of the attorney general. It was his duty to close the estate and deposit the proceeds with the county treasurer.

Under the statement of facts, the defendant settled his final account on November 20, 1919. There were no further debts to be paid, no litigation pending. Nothing, in fact, to do but to close the estate and turn over the property to the state. Where the defendant is guilty of no delay in paying out the money of an estate deposited by him as soon as those entitled to it may receive it, he is not liable for the subsequent loss of the money through failure of the bank. (*Knapp* v. *Jessup*, 146 Mich. 348, 7 L. R. A. (n. s.) 617, 109 N. W. 666.)

Where, however, as in this case, the evidence shows that the funds on deposit were drawing interest at the rate of five per cent per annum, the deposit became an investment and subject to the rules governing investments by trustees. (*McNabb* v. *Wisom*, 7 Nev. 163; *Chancellor* v. *Chancellor*, 177 Ala. 44, 45 L. R. A. (n. s.) 11, 58 South. 423.) While the stipulation shows that the money was deposited in the name of the administrator, yet in effect it was deposited individually, for the reason that the interest was credited, not to the administrator's account, but to his individual account. (*Chancellor* v. *Chancellor*, supra.)

*Messrs. Gibson & Smith*, for Respondents, submitted a brief; *Mr. Fred L. Gibson* argued the cause orally.

The property of the estate did not escheat to the state, without necessity of proceedings had therefor. (*In re Miner's*

*Estate,* 143 Cal. 194, 76 Pac. 968; *People* v. *Roach,* 76 Cal. 294, 18 Pac. 407; *State* v. *Smith,* 70 Cal. 153, 12 Pac. 121–123; *State* v. *Savings Bank,* 186 Cal. 294, 199 Pac. 26.) A thorough reading of our Code provisions relating to the subject will permit of no conclusion other than that proceedings are necessary on the part of the state, regardless of whether the estate consists of real or personal property. (See *In re Pomeroy,* 51 Mont. 119, 151 Pac. 333.)

The supreme court of the state of North Dakota, under statutes identical with those of Montana and California, reached the same conclusions, in the case of *In re McClelland's Estate,* 27 S. D. 109, 28 Ann. Cas. 1029, 129 N. W. 1037, and quoted with approval in case of *In re Miner's Estate,* also cited by us above.

It has now become the settled law of this state that a personal representative may deposit trust money in a bank, pending settlement of the estate, and that if he exercises due care in the selection of a reliable bank for the deposit of current funds of the estate, he is not liable for the failure of the bank, nor does the fact that the deposit draws interest change its nature. (*Pethybridge* v. *First State Bank,* 75 Mont. 173, 243 Pac. 569.)

MR. JUSTICE GALEN delivered the opinion of the court.

This action was instituted by the state of Montana as plaintiff against W. L. Kearns as administrator of the estate of Joseph Brown, deceased, and the American Surety Company as bondsman for the administrator, to recover the sum of $5,390.52, alleged to have escheated to the state. After the defendants had filed their answer, the cause was submitted to the court for decision upon an agreed statement of facts, supplemented by oral testimony and documentary evidence introduced on the part of the plaintiff. The court found in favor of the defendants and entered judgment that the plaintiff take nothing by reason of its complaint. The appeal is from the judgment.

The only question presented for decision is whether the court was in error in entering such judgment.

From the record it appears that on the third day of April, 1919, Joseph Brown, a resident of Park county, residing at Gardiner, died intestate at his place of residence, leaving an estate in Park county consisting of real and personal property. Subsequently, W. L. Kearns was duly and regularly appointed as administrator of the estate, and, having qualified, letters of administration were duly and regularly issued to him on May 6, 1919, since which time he has been and now is the administrator of such estate, and the American Surety Company is now, and at all times subsequent to his appointment has been, the surety on his bond as administrator, in the sum of $15,000. On November 20, 1919, the administrator filed with the court a statement of final account in the matter of the estate for settlement and petitioned for an adjudication of due notice to creditors, in which he charged himself with the receipt of cash on deposit at the time of the death of the deceased amounting to $7,567.42, against which he claimed a credit allowance for disbursements of $2,176, leaving a balance of cash on hand of $5,390.52, besides real estate of the appraised value of $900. In his petition accompanying such account he represented to the court that he had not been able to find any heirs of the deceased, and alleged that the entire estate would escheat to the state of Montana. On December 2, 1919, the court duly and regularly approved his report and account. The money belonging to the estate and the balance of cash shown in such report and account was by the administrator at all times kept and held on deposit to his credit as the administrator of the estate of Joseph Brown, in the Yegen Bros. Bank at Gardiner, which was the only bank in Gardiner, where the administrator resided, and the only one to which he could have access within a distance of over twenty-five miles. It was the bank in which the moneys belonging to the deceased were deposited at the time of his death, and the administrator merely continued the business of the estate therewith as a depositary of estate funds. It was conducted and operated as a private bank by Peter Yegen and Christian Yegen, as copartners, and was at all times subject to examination and super-

vision by the banking department of the state of Montana. Prior to the fifteenth day of February, 1924, when it closed its doors to business, it was a banking institution in good repute and standing, and was to all appearances in a sound and solvent condition, and the defendants did not at any time prior to its failure have any knowledge or notice that it was other than a solvent and going concern, or that funds on deposit with it were in danger of loss. The money of the estate was deposited by the administrator with the bank independent of any court order, and he never made any application to the court or judge for an order permitting him to make deposit of such funds with that bank during the time that he was waiting for the estate to be closed after the settlement of his account, or at all. However, the funds belonging to the estate were at all times kept and held in trust by the defendant Kearns, as administrator, and kept and deposited by him in the bank in his name as administrator of the estate, and were subject to withdrawal without notice. The money so deposited was deposited for safekeeping only, until such time as the estate should be settled and distribution thereof made pursuant to order of the court to the persons entitled thereto, including the state of Montana. There was no pending litigation in the estate at the date of the settlement of the administrator's account, or at any time during the administration of the estate, save and except the proceedings instituted to have the property decreed escheated by the state of Montana hereinafter mentioned.

The administrator was at all times ready, able and willing to make settlement with the state and pay over to it the cash remaining in his hands on December 2, 1919, the date of the settlement of his account and at all times subsequent thereto until the failure of the bank, less disbursements made therefrom for taxes and the premiums paid on his bond. Immediately after the entry of the decree settling the administrator's account, on December 3, 1919, the administrator caused a letter to be written by his attorneys to the attorney general of the state of Montana, at Helena, advising that the estate

was in readiness to be closed, and that, so far as known, the deceased left no heirs; that no will had been found; that the money was on deposit in the Yegen Bros. Bank at Gardiner, and suggesting the propriety of the attorney general instituting escheat proceedings according to law. Later, on April 30, 1920, the administrator again caused a letter to be written by his attorneys to the attorney general, advising the latter that the administrator "was anxious to get the estate closed, but that he did not want to turn the money over to the state without an action having been had in the manner provided by the statute, to declare the estate escheated." The last-mentioned letter was duly received by the attorney general on May 1, 1920, and on May 21, 1920, in acknowledging its receipt, "advised that he would take immediate steps to have the money reduced to the possession of the state so that the administrator might be relieved of further responsibility." No action was taken by the state or its attorney general or by any officer of the state looking toward an escheat of such property to the state until the 17th of December, 1923, at which time an information was regularly filed with the court entitled, "The State of Montana, Plaintiff, v." Certain Described Town Lots Located in the Town of Gardiner, "$5,390.52 in Lawful Money of the United States, and All Persons Interested or Claiming Any Interest Therein, and All Persons Interested or Claiming, Any Interest in the Estate of Joseph Brown, Deceased, Defendants," whereby it was sought to have the real estate and personal property belonging to the estate decreed to have escheated to the state of Montana, as a result of which a decree was duly and regularly entered on February 21, 1924, "ordering that the real estate belonging to the estate be sold, and declaring the real estate and the sum of $5,390.52 in cash" to have escheated to the state of Montana.

The bank suspended business because of insolvency on February 15, 1924, and is now in process of liquidation. At the time it closed its doors there was a credit balance to the admin-

istrator's account of $5,088.21. It will be observed that the decree of escheat was not entered until six days after the bank had suspended business because of its insolvency; and it should be noted that the administrator was not made a party to the proceeding or given independent or special notice thereof.

On May 13, 1925, the administrator rendered and presented to the court a supplemental statement of account in final settlement of the estate, accompanied by his petition for discharge; the only items of expenditure made from the funds in his hands thereby shown and submitted for approval being the sum of $302.31, paid for the premiums on his bond and money advanced for taxes for the years 1920, 1921, 1922 and 1923. On June 2, 1925, the plaintiff appeared and made objection to the discharge of the administrator and the exoneration of his bondsman, by reason of his failure and neglect to pay over to the county treasurer or to the state of Montana the sum of $5,390.52, cash remaining in his hands on the date of the approval of his first report and account, which matter is still pending before the court and undetermined.

Roy L. Vaughn, the receiver of the bank, testified that the books of the bank disclose that Mr. Kearns, the administrator, who was formerly the cashier of the bank, was paid interest at the rate of five per cent on the estate funds deposited with the bank; the amount so paid amounting to $582.26. The estate was not given credit by the administrator in his account for such amount, or any amount of interest.

The determinative question presented is whether the estate [1] of the deceased escheated to the state *eo instante* independent of any court proceedings adjudging it to have so escheated.

It is the generally recognized rule at common law that, upon the death of a person intestate without heirs competent to take, title to his property vests in the state immediately. The reason for this is found in the theory of the feudal tenure that the freehold must vest somewhere; it cannot be in abeyance for even a single minute. There are jurisdictions, however,

which hold that under such circumstances judicial proceedings are necessary to vest title in the state; and this is the rule under statute in certain states. Before the escheat there is no title in the state, merely a possibility of interest. (10 R. C. L. 617.)

"The question whether and in what cases an action is necessary to establish the right of the state has given rise to conflicting views and decisions in the courts of different states. In many of the decisions the courts have attempted, in effect, to substitute the state for the feudal lord or the crown, and to found the rights of the state upon reasoning analogous to the rule of the feudal law. But, under the feudal law, the paramount title remained always in the feudal lord or the crown, and a grant of the fee vested only a tenure, subject to be terminated by the failure of blood capable of inheriting, or the doing of an act which in law worked a forfeiture of the tenure. In either of these events the estate reverted to the original feudal lord or his descendants, or to the crown. It followed at common law that when a forfeiture was to be declared, or when it was sought to reduce the estate to possession, an inquisition or an inquest of office must be had to determine the outstanding rights under the tenure. This proceeding was not for the purpose of vesting the title in the feudal lord or crown, but only for the purpose of declaring a forfeiture or reducing the property to possession. Its purpose was to make matter of record the termination of the rights of those who might claim through the holder of the estate. No such system prevails in this country, and the doctrine and procedure of the common law are of little aid in dealing with the question of title or interest of the state, under escheat statutes founded upon conditions so radically divergent from those of the feudal law." (*In re McClellan's Estate,* 27 S. D. 109, 28 Ann. Cas. 1029, 129 N. W. 1037.)

"In this country, when the title to land fails for want of heirs and devisees, it escheats to the state as part of its common ownership, either by mere operation of law, or upon

an inquest of office, according to the law of the particular state. 4 Kent Com. 424; 3 Washb. Real Prop. (4th Ed.) 47, 48." (*Hamilton* v. *Brown,* 161 U. S. 256, 40 L. Ed. 691, 16 Sup. Ct. Rep. 585.)

At common law, an escheat was deemed applicable only to real estate or an interest therein. It represented the reversionary interest or right of the lord to take for want of an owner. However, by statute, personal property has also been expressly made subject to escheat, and it is now the generally recognized rule that all property, real and personal, and every right of property of whatever nature, is subject to escheat to the state. (10 R. C. L. 604.) By our statute (sec. 206, Rev. Codes 1921) it is provided: "It is the duty of the attorney general to institute investigation for the discovery of all real and personal property which may have escheated or should escheat to the state, and for that purpose has the power to cite any and all persons before any of the district courts of this state to answer investigations and render accounts concerning said property, real or personal, and to examine all books and papers of any and all corporations. When any real or personal property is discovered, which should escheat to the state, the attorney general must institute suit in the district court of the county where said property shall be situated, for the recovery, to escheat the same to the state. The proceedings in all such actions shall be those provided for in sections 9959 to 9962 of these Codes."

And sections 9959 et seq. require the attorney general, in behalf of the state, to file an information in the district court in the county in which the estate or any part thereof is situated, "setting forth a description of the estate, the name of the person last seized, the name of the occupant and person claiming such estate, if known, and the facts and circumstances in consequence of which the estate is claimed to have escheated, with an allegation that, by reason thereof, the state of Montana has right by law to such estate. Upon such information a summons must issue to such person, requiring him to appear and answer the information within the time allowed by law

in civil actions; and the court must make an order setting forth briefly the contents of the information, and requiring all persons interested in the estate to appear and show cause, if any they have, within forty days from date of the order, why the same should not vest in the state; which order must be published for at least one month from the date thereof, in a newspaper published in the county, if one be published therein, and in case no newspaper is published in the county, in some other newspaper in this state." Provision is made for appearance in the action and for trial thereof, and "if, after the issues are tried, it appears from the facts found or admitted that the state has good title to the lands and tenements in the information mentioned, or any part thereof, judgment must be rendered that the state be seized thereof." Real estate escheating to the state by reason of a judgment rendered by a court of competent jurisdiction shall, on motion of the attorney general, be by the court or judge ordered to be sold at public sale, and the proceeds of such sale, after the deduction of specified costs and fees, shall be paid into the state treasury. Within twenty years after the judgment, any heir who is not a party or privy to such proceedings may file his petition, "showing his claim or right to the property, or the proceeds thereof."

These Code sections were adopted by us from California, and are practically identical with sections 1269–1272 of the Code of Civil Procedure of the latter state. They became incorporated as a part of the Codes of California in 1872, and were adopted by this state in 1895. The correct construction to be placed upon them in conjunction with other Code provisions (our section 206) and their effect is well stated in 10 Cal. Jur., page 569, based on California decisions, as follows: "By the civil law, as well as the common law, the king cannot take upon himself the possession of an estate said to have escheated until the fact is judicially ascertained by a proceeding in the nature of an inquest of office. Although in some states the rule is that title to an escheat vests immediately in the state upon the happening of the act which causes

it, the opposite rule prevails in California where the decisions hold that some judicial proceeding is necessary to perfect the escheat. The state does not come into property by way of succession, and an action of escheat is necessary to vest title in it. While the provisions of the Code of Civil Procedure in reference to actions of escheat, taken by itself, might imply, from the language used, that such action was necessary, only where real estate was involved, considering the various provisions of the several Codes bearing upon the subject, it is said to be clear that in every case of a failure of succession for want of heirs or kindred of the decedent, an action of escheat becomes necessary to vest the title in the state, regardless of the kind of property involved.''

This rule, applicable under our statutes, was given recognition by the supreme court of California in *People* v. *Roach,* 76 Cal. 294, 18 Pac. 407, as early as 1888. As to property escheating to the state under statute, the supreme judicial court of Massachusetts, as early as 1834, pronounced the correct doctrine, which appears fundamental to us under our statutory provisions: ''Where a subject dies intestate, as the estate descends to collateral kindred indefinitely, the presumption of law is that he had heirs, and this presumption will be good against the commonwealth until they institute the regular proceedings by inquest of office, by which the fact whether the intestate did or did not die without heirs can be ascertained, and if this fact is established in favor of the commonwealth, it rebuts the contrary presumption, and the commonwealth, by force of the judgment, and of the statute before cited, becomes seized in law and in fact. In such case therefore, the courts are of opinion, that an inquest of office is necessary, and that the commonwealth cannot be deemed to be seized without such inquest. (*Jackson* v. *Adams,* 7 Wendell [N. Y.] 367; *Doe* v. *Redfern,* 12 East. (Eng.), 96.) * * * These are highly reasonable and equitable provisions, and it is manifestly for the quiet of the commonwealth and the security of the citizen, that they should be

pursued, before the commonwealth shall be permitted to take into its own custody and dispose of estates, upon a claim, which, if not doubtful, is at least not apparent." (*Wilbur* v. *Tobey*, 16 Pick. (Mass.) 177, 180; *Hamilton* v. *Brown*, supra.)

And in the *Estate of Miner*, 143 Cal. 194, 76 Pac. 968, decided May 6, 1904, the court held that: "The provision of the Code of Civil Procedure in reference to escheats, taken by itself, might imply from the language used, that such action was only necessary where real estate was involved, but the provisions of the various Codes bearing upon the same subject-matter must be construed *in pari materia*. (Pol. Code, sec. 4480.) Under this rule, and considering the various provisions of the several Codes bearing upon the subject, it seems very clear that in every case of a failure of succession for want of heirs or kindred of the decedent an action of escheat becomes necessary to vest the title in the state, whether the estate so escheated consists of real or personal property." Indeed, authority for such interpretation and application of our statutes, is to be found in a former decision of this court in the case of *In re Pomeroy*, 51 Mont. 119, 151 Pac. 333, wherein it was held, and we think correctly, that: "Under the Compiled Statutes, if the intestate in fact left no heirs, the property passed *eo instante* to the state and no inquest of office or other proceeding was necessary to vest title. Under the Codes of 1895 the title to property owned by one who died intestate without heirs did not vest immediately in the state. To complete the escheat a proceeding in the nature of an inquest of office was necessary, and then the determination of the court, though in form a decree that the property belonged to the state, operated only to convey a title defeasible for the term of twenty years, and complete upon the expiration of that period if a valid adverse claim was not presented. (Code of Civil Pro., secs. 2250–2253.) And this is the state of the law to-day. (Rev. Codes, secs. 7356–7359.)"

A contrary view of the law as applied to real estate has been entertained by many respectable authorities in the United

States. (*In re Melrose Avenue,* 234 N. Y. 48, 23 A. L. R. 1233, and extensive note at page 1237, 136 N. E. 235.) While sections 9959 to 9962 of our present Codes, the law since their adoption from California in 1895, relate exclusively to real estate, the provisions thereof are expressly made applicable also to personal property by section 206, which became a part of our Codes at the same time. Section 206 is made a part of the Political Code and sections 9959 to 9962 are a part of the Code of Civil Procedure; however, in the absence of express reference they are to be construed as parts of the same statute (Id., sec. 5552), but here section 206 especially prescribes and adopts the proceedings applicable to real estate contained in sections 9959 to 9962 by express reference as the procedure respecting the escheat of personal property. We hold that proceedings must be instituted in order to escheat property to the state in accordance with sections 9959 to 9962 of our Codes, whether the estate consists of real estate or personal property.

The time when such proceedings may be instituted presents
[2] another matter for consideration controlled by other statutory provision. (Sec. 7088.) Proceedings by the attorney general to reduce the property of an estate claimed to have escheated to the state to its possession, or in the nature of an inquest of office to determine whether the state has succeeded to the property rights of an intestate, may not in any event be commenced within five years after the death of the decedent. (Sec. 7088, Rev. Codes 1921; *State ex rel. Donovan* v. *District Court,* 25 Mont. 355, 65 Pac. 120; 10 Cal. Jur. 570.) However, the state is possessed of sufficient interest in the estate, before proceedings to escheat have been regularly instituted, to warrant its attorney general in objecting to the settlement of the administrator's accounts, as appears to have been done by him in this case. (*State ex rel. Donovan* v. *District Court,* supra; *State ex rel. Donovan* v. *Ledwidge,* 27 Mont. 197, 70 Pac. 511.)

[79 Mont. 299.]

From the facts appearing in this case we are of opinion [3] that the administrator exercised reasonable care in depositing the funds belonging to the estate in the Yegen Bros. Bank at Gardiner, and that in consequence he should not be held personally liable because of the failure of the bank. (*Pethybridge* v. *First State Bank of Livingston,* 75 Mont. 173, 243 Pac. 569.) Therefore, the money and property of the estate having been at all times involved herein rightfully and properly held by the administrator in the course of the administration of the trust, and the funds of the estate having been deposited in a bank selected by the administrator in the exercise of reasonable care, while he must be held to account therefor, he will not be subjected to personal liability for the amount of money which may be lost because of the bank's failure. He was not obliged to pay the money over to the state prior to adjudication of its escheat to the state, and was required only to exercise reasonable care in the selection of a depositary pending a final conclusion of the administration of the estate. As to the question of the liability of the administrator to account for interest paid on the funds of the estate deposited with the bank, the court will make determination thereof in the probate proceeding still pending wherein the attorney general has contested the administrator's final account and made objection to his discharge.

For the reasons stated, the judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES MYERS, STARK and MATTHEWS concur.